IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

LAURA SUE HALPERIN,  )
                                     )
                 Plaintiff, )
                                     )
                    v. )      1:18CV396
                                     )
ANDREW SAUL, )
Commissioner of Social Security,[1] )
                                     )
                 Defendant. )

<u>MEMORANDUM OPINION AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE</u>

Plaintiff Laura Sue Halperin ("Plaintiff") brought this action pursuant to Section 205(g) of the Social Security Act (the "Act"), as amended (42 U.S.C. § 405(g)), to obtain judicial review of a final decision of the Commissioner of Social Security denying her claim for Disability Insurance Benefits ("DIB") under Title II of the Act. The parties have filed cross-motions for judgment, and the administrative record has been certified to the Court for review.

I.     <u>PROCEDURAL HISTORY</u>

Plaintiff protectively filed an application for DIB on June 7, 2013, alleging a disability onset date of May 12, 2012. (Tr. at 17, 315-18.)[2] Her application was denied initially (Tr. at 114-22, 166-69) and upon reconsideration (Tr. at 123-42, 171-74). Thereafter, Plaintiff

---

[1] Andrew Saul was confirmed as the Commissioner of Social Security on June 4, 2019, and was sworn in on June 17, 2019. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Andrew Saul should be substituted for Nancy A. Berryhill as the Defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

[2] Transcript citations refer to the Sealed Administrative Record [Doc. #9].

requested an administrative hearing de novo before an Administrative Law Judge ("ALJ"). (Tr. at 177-78.) On July 27, 2016, Plaintiff, proceeding pro se, and an impartial vocational expert ("VE") attended the subsequent hearing. (Tr. at 69-101.) The ALJ ultimately ruled that Plaintiff did not qualify as disabled at any time from her onset date, May 12, 2012, to her date last insured ("DLI") for DIB, September 30, 2015. (Tr. at 143-57.) However, the Appeals Council granted Plaintiff's request for review, finding that Plaintiff's DLI at the time of the ALJ's decision was December 31, 2015, rather than September 30, 2015, and that, due to Plaintiff's additional earnings in 2016, her current DLI was December 31, 2017. (Tr. at 162-65, 238-43.)

Upon remand, a second hearing was held before the same ALJ, which Plaintiff, her attorney, and another impartial VE attended. (Tr. at 39-68.)[3] The ALJ again concluded that Plaintiff was not disabled within the meaning of the Act (Tr. at 14-32), and, on March 9, 2018, the Appeals Council denied Plaintiff's request for review of the decision, thereby making the ALJ's conclusion the Commissioner's final decision for purposes of judicial review (Tr. at 1-7, 311-14).

II. LEGAL STANDARD

Federal law "authorizes judicial review of the Social Security Commissioner's denial of social security benefits." Hines v. Barnhart, 453 F.3d 559, 561 (4th Cir. 2006). However, the scope of review of such a decision is "extremely limited." Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981). "The courts are not to try the case de novo." Oppenheim v. Finch, 495 F.2d

---

[3] At the outset of the second hearing, Plaintiff amended her onset date to April 1, 2013, to correspond with the first month she treated with Dr. Paul Bradley Segebarth for her scoliosis. (Tr. at 17, 42.)

2

396, 397 (4th Cir. 1974). Instead, "a reviewing court must uphold the factual findings of the ALJ if they are supported by substantial evidence and were reached through application of the correct legal standard." Hancock v. Astrue, 667 F.3d 470, 472 (4th Cir. 2012) (internal quotation omitted).

"Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1993) (quoting Richardson v. Perales, 402 U.S. 389, 390 (1971)). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (internal citations and quotation marks omitted). "If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is substantial evidence." Hunter, 993 F.2d at 34 (internal quotation marks omitted).

"In reviewing for substantial evidence, the court should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ]." Mastro, 270 F.3d at 176 (internal brackets and quotation marks omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the ALJ." Hancock, 667 F.3d at 472. "The issue before [the reviewing court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996).

In undertaking this limited review, the Court notes that "[a] claimant for disability benefits bears the burden of proving a disability." Hall v. Harris, 658 F.2d 260, 264 (4th Cir.

1981). In this context, "disability" means the "'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.'" Id. (quoting 42 U.S.C. § 423(d)(1)(A)).[4]

"The Commissioner uses a five-step process to evaluate disability claims." Hancock, 667 F.3d at 472 (citing 20 C.F.R. §§ 404.1520(a)(4); 416.920(a)(4)). "Under this process, the Commissioner asks, in sequence, whether the claimant: (1) worked during the alleged period of disability; (2) had a severe impairment; (3) had an impairment that met or equaled the requirements of a listed impairment; (4) could return to her past relevant work; and (5) if not, could perform any other work in the national economy." Id.

A finding adverse to the claimant at any of several points in this five-step sequence forecloses a disability designation and ends the inquiry. For example, "[t]he first step determines whether the claimant is engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied. The second step determines if the claimant is 'severely' disabled. If not, benefits are denied." Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at the first two steps, and if the claimant's impairment meets or equals a "listed impairment" at step three, "the claimant is disabled." Mastro, 270 F.3d at 177. Alternatively, if a claimant clears steps one and two,

---

[4] "The Social Security Act comprises two disability benefits programs. The Social Security Disability Insurance Program (SSDI), established by Title II of the Act as amended, 42 U.S.C. § 401 et seq., provides benefits to disabled persons who have contributed to the program while employed. The Supplemental Security Income Program (SSI), established by Title XVI of the Act as amended, 42 U.S.C. § 1381 et seq., provides benefits to indigent disabled persons. The statutory definitions and the regulations promulgated by the Secretary for determining disability, see 20 C.F.R. pt. 404 (SSDI); 20 C.F.R. pt. 416 (SSI), governing these two programs are, in all aspects relevant here, substantively identical." Craig, 76 F.3d at 589 n.1.

but falters at step three, i.e., "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment," then "the ALJ must assess the claimant's residual functional capacity ('RFC')." Id. at 179.[5] Step four then requires the ALJ to assess whether, based on that RFC, the claimant can "perform past relevant work"; if so, the claimant does not qualify as disabled. Id. at 179-80. However, if the claimant establishes an inability to return to prior work, the analysis proceeds to the fifth step, which "requires the [Government] to prove that a significant number of jobs exist which the claimant could perform, despite the claimant's impairments." Hines, 453 F.3d at 563. In making this determination, the ALJ must decide "whether the claimant is able to perform other work considering both [the claimant's RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job." Hall, 658 F.2d at 264-65. If, at this step, the Government cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled. Hines, 453 F.3d at 567.

III. DISCUSSION

In the present case, the ALJ found that Plaintiff had not engaged in "substantial gainful activity" since her amended alleged onset date. The ALJ therefore concluded that Plaintiff

---

[5] "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." Hines, 453 F.3d at 562 (noting that administrative regulations require RFC to reflect claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation marks omitted)). The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." Hall, 658 F.2d at 265. "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (e.g., pain)." Hines, 453 F.3d at 562-63.

5

met her burden at step one of the sequential evaluation process. (Tr. at 19.) At step two, the ALJ further determined that Plaintiff suffered from the following severe impairments:

> scoliosis and mild degenerative disc disease, status post spine surgeries in March 2017; seizure disorder; depressive disorder; and anxiety disorder.

(Tr. at 20.) The ALJ found at step three that none of these impairments, individually or in combination, met or equaled a disability listing. (Tr. at 21-23.) Therefore, the ALJ assessed Plaintiff's RFC and determined that she could perform light work with further limitations. Specifically, the ALJ found that Plaintiff

> [required] a sit/stand option at a thirty-minute interval . . . ; [could] occasional[ly] climb, balance, stoop, kneel, crouch, and crawl; no concentrated exposure to hazards; [was] capable of simple, routine, repetitive tasks for two hour intervals throughout the day for the duration of the workday; the work should be performed in a stable work environment; there should be no production work and no assembly line work; no more than occasional public contact; no more than occasional contact with coworkers.

(Tr. at 23.) Under step four of the analysis, the ALJ determined that Plaintiff could not perform any of her past relevant work. (Tr. at 30.) However, the ALJ concluded at step five that, given Plaintiff's age, education, work experience, and RFC, along with the testimony of the VE regarding those factors, Plaintiff could perform other jobs available in the national economy and therefore was not disabled. (Tr. at 30-32.)

Plaintiff now raises one challenge to the ALJ's decision. Plaintiff argues that "[t]he ALJ erred in law when he failed to find that [Plaintiff] medically equaled Social Security Listing 14.09C1." (Pl.'s Br. [Doc. #13] at 6.) In particular, Plaintiff contends her scoliosis and kyphosis are medically equivalent to the requirements of Listing 14.09C1. (Id. at 7-8 (citing Tr. at 483, 713).) After a careful review of the record, the Court finds no basis for remand.

6

"Under Step 3, the regulation states that a claimant will be found disabled if he or she has an impairment that 'meets or equals one of [the] listings in appendix 1 of [20 C.F.R. Pt. 404, Subpt. P] and meets the duration requirement.'" Radford v. Colvin, 734 F.3d 288, 293 (4th Cir. 2013) (quoting 20 C.F.R. § 404.1520(a)(4)(iii)). "The listings set out at [20 C.F.R. Pt. 404, Subpt. P, App'x 1], are descriptions of various physical and mental illnesses and abnormalities, most of which are categorized by the body system they affect. Each impairment is defined in terms of several specific medical signs, symptoms, or laboratory test results." Sullivan v. Zebley, 493 U.S. 521, 529–30 (1990). "In order to satisfy a listing and qualify for benefits, a person must meet all of the medical criteria in a particular listing." Bennett, 917 F.2d at 160 (citing Sullivan, 493 U.S. at 530, and 20 C.F.R. § 404.1526(a)).

As explained at great length in both 20 C.F.R. § 404.1526(a) and Social Security Ruling 96-6p, Titles II and XVI: Consideration of Administrative Findings of Fact by State Agency Medical and Psychological Consultants and Other Program Physicians and Psychologists at the Administrative Law Judge and Appeals Council Levels of Administrative Review; Medical Equivalence, 1996 WL 374180 (July 2, 1996) ("SSR 96-6p"), an impairment "is medically equivalent to a listed impairment if it is at least equal in severity and duration to the criteria of any listed impairment." Pethel v. Colvin, No. 1:12CV1045, 2015 WL 631156, at *2 (M.D.N.C. Feb. 12, 2015) (Osteen, C.J.).[6] "To establish medical equivalence, a claimant must present

---

[6] The Court notes that for claims filed after March 27, 2017, the regulations have been amended and several of the prior Social Security Rulings, including SSR 96-6p, have been rescinded. However, the claim in the present case was filed before March 27, 2017, and the Court has therefore analyzed Plaintiff's claims pursuant to the rules set out above. See SSR 17-2p, Titles II and XVI: Evidence Needed by Adjudicators at the Hearings and Appeals Council Levels of the Administrative Review Process to Make Findings About Medical Equivalence, 2017 WL 3928306 (March 27, 2017) (rescinding SSR 96-6p).

medical findings equal in severity to all the criteria for that listing." Id. (emphasis added) (citing Sullivan, 493 U.S. at 531). "Importantly, the plaintiff bears the burden at step three to establish that he meets or medically equals a listed impairment." Pethel, 2015 WL 631156, at *2 (citing Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1993)).

Although no specific listing exists for scoliosis or kyphosis, the introductory section to the listings for spinal disorders provides, in pertinent part, as follows:

> Abnormal curvatures of the spine (specifically, scoliosis, kyphosis and kyphoscoliosis) can result in impaired ambulation . . . . When there is impaired ambulation, evaluation of equivalence may be made by reference to 14.09A. When the abnormal curvature of the spine results in symptoms related to fixation of the dorsolumbar or cervical spine, evaluation of equivalence may be made by reference to 14.09C.

20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 1.00L (emphasis added). In turn, Listing 14.09C1 addresses inflammatory arthritis and requires the following:

> Ankylosing spondylitis or other spondyloarthropathies, with:
>
> 1. Ankylosis (fixation) of the dorsolumbar or cervical spine as shown by appropriate medically acceptable imaging and measured on physical examination at 45° or more of flexion from the vertical position (zero degrees).

Id., § 14.09C1.[7] The introductory section to the listing further explains as follows:

> Listing-level severity in . . . 14.09C1 is shown by an impairment that results in an "extreme" (very serious) limitation. . . . In 14.09C1, if you have the required ankylosis (fixation) of your cervical or dorsolumbar spine, we will find that you

---

[7] The Court notes that the ALJ also found that Plaintiff did not meet Listing 14.09C2, which requires Ankylosis (fixation) of the dorsolumbar or cervical spine as shown by appropriate medically acceptable imaging and measured on physical examination at 30° or more of flexion (but less than 45°) measured from the vertical position (zero degrees), and involvement of two or more organs/body systems with one of the organs/body systems involved to at least a moderate level of severity.
Plaintiff does not challenge that determination, and instead challenges only the determination as to Listing 14.09C1, addressed above.

8

have an extreme limitation in your ability to see in front of you, above you, and to the side. Therefore, <u>inability to ambulate effectively is implicit in 14.09C1</u>.

<u>Id.</u>, § 14.00D6(e)(i) (emphasis added).

The ALJ recited the provisions of Sections 1.00L and 14.09C, and then provided the following rationale for why Plaintiff's scoliosis and kyphosis did not medically equal Listing 14.09C:

> The [ALJ] does not find that the evidence establishes sufficiently that the claimant's scoliosis equals either subparagraph of 14.09C. The medical evidence does show that claimant had a curvature measured at 58° in April 2013 [(Tr. at 483)]; 45° to 50° in September 2013 [(Tr. at 502)], 58° in May 2015 [(Tr. at 737)], and 80° in October 2015 [(Tr. at 713)]. <u>However, listing 14.09 requires more than just curve measurements</u>. Listing 14.09 focuses on fixation (kyphosis) and [Plaintiff's] medical records do not address this in enough detail for a medical equivalence finding. For example, the [ALJ] notes that the imaging in April 2014 indicates that her primary curve measured 58° but the report says "there was *some* upper lumbar kyphosis in the curvature." This suggests that there was not fixation throughout the curve.
>
> Further, the introductory comments to 14.00 indicate that consideration goes beyond the curvature measurements. Section 14.00D6(e)(i) indicates that listing-level severity in 14.09C1 is shown by an impairment that results in an "extreme" (very serious) limitation. For example, <u>such an individual would show extreme limitation in their ability to see in front of themselves, above themselves, and to the side. Inability to ambulate effectively is implicit in 14.09C1</u>. [Plaintiff] did not have range of motion limitations to that extreme prior to surgery. [Plaintiff] did not demonstrate any gait disturbance until just before the surgery. Even then, she remained able to ambulate effectively.
>
> Listing-level severity [a]s shown in 14.09C2 requires involvement of two or more organs/body systems with one of the organs/body systems involved to at least a moderate level of severity. The record does not establish this.

(Tr. at 21-22 (emphasis added).) For the reasons discussed below, Plaintiff has not shown reversible error arising from the ALJ's above-quoted analysis.

Plaintiff first contends that, contrary to the ALJ's determination, findings from office visits with Dr. Segebarth on April 30, 2013, and with Dr. Chewning on October 8, 2015,

9

demonstrate that Plaintiff's scoliosis and kyphosis are medically equivalent to the requirements of Listing 14.09C1. (Pl. Br. at 7-8 (citing Tr. at 483, 713).) According to Plaintiff, "Dr. Segebarth took lateral standing x-rays which showed upper lumbar kyphosis and a curve from her T9 to L3 vertebrae measuring about 58°'" (Pl. Br. at 7-8 (citing Tr. at 483)), thus demonstrating "kyphosis of the dorsolumbar spine as shown by x-rays, which are appropriate medically acceptable imaging" and "58 degrees of flexion, measured from a vertical position" (Pl. Br. at 8). Plaintiff additionally points out that Dr. Chewning "observed that [Plaintiff] was 'very hyperkyphotic' in the thoracic spine" (Pl. Br. at 8 (citing Tr. at 713)), and "found that [Plaintiff's] lateral standing curve from L3 to T11 measured 80 degrees" (Pl. Br. at 8), which Plaintiff contends meets the requirements of Listing 14.09C1 and contradicts "the ALJ's finding that [Plaintiff's] kyphosis [wa]s limited to her lumbar spine" (Pl. Br. at 9).

However, Plaintiff's argument fails to accurately distinguish between scoliosis, kyphosis, and the requirements of Listing 14.09C1. As noted by Plaintiff, kyphosis is an "abnormally increased convexity in the curvature of the thoracic vertebral column as viewed from the side; hunchback." (Pl. Br. at 7 (citing Dorland's Illustrated Medical Dictionary 992 (Elsevier Saunders 32d ed. 2012).) See also Koenig v. Stouffer, 2013 WL 625337 (D. Md. Feb. 19, 2013) ("Kyphosis is a curving of the spine that causes a bowing or rounding of the back, which leads to a hunchback or slouching posture." (citing www.ncbi.nlm.nih.gov.)). Scoliosis is an "abnormal lateral curvature of the spine," that is, an S-shaped or C-shaped deformity, where "the degree of curvature is measured on the coronal plane," viewed from the front or back. American Association of Neurological Surgeons, Scoliosis, www.aans.org. Plaintiff's medical imaging records reflect scoliosis, or lateral curvature, of 58° in 2013 and 80° in 2015,

as noted by the ALJ. (Tr. at 21-22, 483, 502, 737, 713.) In addition, Plaintiff's records reflect "some" unspecified upper lumber kyphosis (forward curvature) in 2013, also reflected as a "rotatory hump with kyphotic appearance" in 2015. (Tr. at 22, 483, 713.) These records do not reflect any specified degree of kyphosis (forward bowing or rounding).[8] These records also do not reflect a fixation (ankylosis) of any specified degree. Most importantly, there is no evidence of any <u>fixation measured on physical examination</u> at "<u>45° or more of flexion from the vertical position</u>" as required by Listing 14.09C1. See also Partipilo v. Colvin, 2015 WL 225054 (M.D. Tenn. Jan. 15, 2015) ("A diagnosis of an abnormal curvature of the spine, for example, says nothing about the severity of such a condition, and there is no evidence that the plaintiff's scoliosis and kyphosis have resulted in fixation of the spine. Similarly, a Cobb angle, which is used to measure the degree of scoliosis, is not itself indicative of fixation of the spine."). Thus, the mere fact that Plaintiff's doctors found lateral curvature of Plaintiff's spine and some unspecified degree of kyphosis in Plaintiff's upper lumbar spine does not equate to a finding that Plaintiff suffered from "<u>symptoms related to fixation of the dorsolumbar spine</u>," measurable on physical examination at "45° or more of flexion from the vertical position." 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 1.00L, § 14.09C1 (emphasis added), i.e., remaining in at least a 45-degree forward-flexed position that seriously limited her ability to see in front of her, above her, and to the side, <u>id.</u> § 14.00D6(e)(i). As specifically held by the ALJ, "listing 14.09 requires more than just curve measurements" and Plaintiff's medical records do not

---

[8] Plaintiff's scoliosis consisted of a left-pointing curve in her thoracolumbar spine of anywhere from 45 to 80 degrees when viewed from behind. (See Tr. at 483, 502, 713, 737.) Unlike kyphosis, Plaintiff's scoliosis caused her body to tilt <u>laterally</u>, causing her rib cage to move towards her pelvis. (See Tr. at 683, 704.) Plaintiff makes no argument that her scoliosis caused her to maintain a forward-flexed posture or prevented her from being able to see in front of her, above her, or to the side.

11

include evidence regarding fixation or kyphosis "in enough detail for a medical equivalence finding." (Tr. at 22.) As noted by the ALJ, the physical examinations themselves reflected that she moved easily, had good balance, had good range of motion, and had full strength and sensation (Tr. at 25, 483), with no indication of fixation measured on physical examination of flexion from the vertical position.[9]

Plaintiff also argues that "[t]he ALJ [ ] erred in law by arguing that Section 14.00D6(e)(i) imposes an additional requirement on [Plaintiff] for meeting Listing 14.09C1" (Pl. Br. at 10), by requiring a showing of "gait disturbance" and "an extreme limitation in her ability to see in front of her, above her, and to the side" (id. at 12). As noted above, in undertaking the Listing analysis at step three, the ALJ considered the introductory comments to 14.00, that "listing level severity in 14.09C1 is shown by an impairment that result in an 'extreme' (very serious limitation." (Tr. at 22.) The ALJ then continued with examples: "For example, such an individual would show extreme limitation in their ability to see in front of themselves, above themselves, and to the side," and "[i]nability to ambulate effectively is implicit in 14.09C1." (Tr. at 22.) According to Plaintiff, the Social Security Administration's "commentary when it adopted the current form of Listing 14.09C1 make clear that: '[w]e believe ankylosing spondylitis or other spondyloarthropathies with ankylosis of the dorsolumbar or cervical spines at 45° or more of flexion documented as required in final listing 14.09C1 are in themselves indicative of an impairment that precludes any gainful activity.'" (Pl. Br. at 11 (quoting Revised Medical Criteria for Evaluating Immune System Disorders, 73 Fed. Reg.

---

[9] The Court also notes that, contrary to Plaintiff's allegations (see Pl. Br. at 8-10 (citing Tr. at 713)), Dr. Chewning did not find "hyperkyphosis" in Plaintiff's thoracic spine. Indeed, Dr. Chewning found just the opposite – that Plaintiff's thoracic spine was "very hypokyphotic" (Tr. at 713, 704 (emphasis added)), meaning that she lacked some of the normal curvature in her thoracic spine.

14570-01, 14585 (Mar. 18, 2008).) Thus, Plaintiff maintains that, as long as she shows "the required fixation of [her] dorsolumbar spine," she has inherently already shown an extreme limitation in her ability to see around herself and, by extension, an inability to ambulate effectively. (Pl. Br. at 12 (ellipses omitted).) Plaintiff's argument fails for the simple reason that she has <u>not</u> shown the required fixation of her dorsolumbar spine (or "symptoms related to [such] fixation," 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 1.00L). This failure is simply further reflected in the lack of any limitation in her ability to see around herself and the lack of an inability to ambulate effectively, as noted by the ALJ.

Finally, Plaintiff contends that, "[e]ven if Section 14.00D6(e)(i) did require that [Plaintiff] demonstrate an additional, extreme limitation, such as an inability to ambulate effectively in order to equal Listing 14.09C1, [Plaintiff] has done so." (Pl. Br. at 12.) Plaintiff notes that she "suffered stumbles and falls on account of her scoliosis" (Pl. Br. at 12 (citing Tr. at 728)), and that "[t]he ALJ acknowledged that [Plaintiff] had gate [sic] disturbance before her surgery (Pl. Br. at 12 (citing Tr. at 22)). However, sporadic findings of an antalgic gait (<u>see</u> Tr. at 726 (Sept. 2, 2015), 686 (Feb. 27, 2017)), and Plaintiff's subjective report on one occasion of stumbles (<u>see</u> Tr. at 728), do not establish an "inability to ambulate effectively" as defined by § 14.00C6 (in turn relying on definition in § 1.00B2(b)), which requires "having insufficient lower extremity functioning to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities," 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 1.00B2(b). Based on the evidence in the record, the ALJ found that Plaintiff "did not demonstrate any gait disturbance until just before the surgery," and "[e]ven then, she remained able to ambulate effectively," (Tr. at 22, 704), and there is substantial

evidence in the record, and set out in the ALJ's decision, to support that conclusion (Tr. 24-27, 483, 534, 542, 579, 593, 753, 780, 1253).[10]

Accordingly, Plaintiff has not established that the ALJ committed reversible error in determining that Plaintiff's scoliosis and kyphosis did not medically equal Listing 14.09C1.[11]

IT IS THEREFORE RECOMMENDED that the Commissioner's decision finding no disability be AFFIRMED, that Plaintiff's Motion for Judgment Reversing or Remanding for Further Proceedings the Decision of the Commissioner of Social Security [Doc. #12] be DENIED, that Defendant's Motion for Judgment on the Pleadings [Doc. #17] be GRANTED, and that this action be DISMISSED with prejudice.

This, the 2nd day of August, 2019.

/s/ Joi Elizabeth Peake
United States Magistrate Judge

---

[10] Plaintiff also notes that she reported difficulty eating and breathing because of her ribcage collapsing into her pelvis in the months leading up to her spinal surgery (see Tr. at 683 (Feb. 27, 2017), 704 (Aug. 23, 2016)). However, no objective documentation of malnutrition, significant weight loss, or shortness of breath exists in the record. Indeed, the ALJ noted that Plaintiff lost 12 pounds after being advised to lose weight in 2015 to reduce the stress on her back, but her weight was back up to 152 pounds in 2016 and had been stable since. (Tr. at 20.) Similarly, the ALJ acknowledged Plaintiff's testimony that she "had trouble breathing if she was lying on her left side" (Tr. at 24), but even then, she elected to wait a few more months to schedule surgery so that she could take care of "her family and work needs" (Tr. at 26). The ALJ specifically concluded that the record did not establish involvement of two or more organs/body systems with at least one at a moderate level of severity (Tr. at 22), and thus fully analyzed Listing 14.09C2 as well.

[11] In her Reply Brief, Plaintiff references the opinion evidence of Dr. Segebarth and Dr. Chewning. (Pl. Reply [Doc. #20] at 2-4.) However, the ALJ considered and weighed this evidence at length, and Plaintiff did not raise a challenge to the ALJ's treatment of the opinion evidence in her appeal in this case, and instead limited her challenge to the ALJ's listing determination at step three at to Listing 14.09C1. Moreover, nothing in the opinion evidence affects the step three determination or establishes listing-level equivalence.